IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BOBBY MARION DIXON,

    Petitioner,               No. CIV S-06-0410 JAM GGH P

    vs.

MICHAEL S. EVANS,

    Respondent.          FINDINGS & RECOMMENDATIONS

/

*Introduction and Summary*

    Petitioner seeks to have his first degree felony murder conviction, as well as lesser convictions, overturned due to injection of "gang testimony" into his trial after the trial court had ordered that no such reference should be made. He also seeks to have the murder conviction overturned on account of an allegedly faulty jury instruction on aiding and abetting. The first issue falls because the trial court's and Court of Appeal handling of the issue is beyond AEDPA reproach. The second issue fares no better because petitioner is simply arguing with a California appellate court's determination on a matter of state law.

\\\\\

\\\\\

\\\\\

*Procedural History*

Petitioner was convicted of first degree murder on a felony murder aiding and abetting theory, attempted robbery, assault with a deadly weapon, conspiracy to commit robbery, and auto theft. The jury also found true a firearms allegation. However, the jury could not reach a verdict of felony murder special circumstance, and a mistrial was declared on this aspect of the case. Petitioner has not been re-prosecuted on the special circumstance.

Petitioner was sentenced to 25 years to life on the murder conviction, and a determinate sentence of 7 years and 8 months on the lesser convictions, the precise allocation for which is not relevant to the habeas action.

After proceeding to direct review with the California Court of Appeal (conviction affirmed), and later on petition for review with the California Supreme Court (denied), a federal petition was filed on August 6, 2006. With court permission, petitioner later filed an amended petition on April 23, 2007. Within that petition, four claims were raised:

(1) Failure to hold a Cal. Evid. Code § 1360 hearing to validate out-of-court statements;

(2) Undue prejudice from witness' reference to gangs despite court order not to do so (framed as a failure to grant a mistrial);

(3) Incorrect Jury Instructions with respect to aiding and abetting;

(4) Denial of defense request to modify the reasonable doubt instructions.

Petitioner does not contest the fact the first claim in the amended petition alleging a violation of state law has not been exhausted. Nor does petitioner's counsel contest the claim on the merits with any briefing. The undersigned therefore finds the claim abandoned.[1] The

---

[1] The amended petition is the operative petition. Counsel for petitioner, a very experienced habeas counsel, knew better than to brief issues which had no color to them. The amended petition and traverse opposition have, in essence, waived opposition on Claims 1 and 4. Kohler v Inter-Tel Techs., 244 F.3d 1167, 1182 (9th Cir. 2001.) Bare contentions, unsupported by explanation or authority, are deemed waived. See FDIC v. Garner, 126 F.3d 1138, 1145 (9th Cir. 1997) (claim waived when no case law or argument in support is presented); Seattle School Dist., No. 1 v. B.S., 82 F.3d 1493, 1502 (9th Cir. 1996) (party who presents no explanation in support of claim of error waives issue); see also Pelfresne v. Village of Williams Bay, 917 F.2d

same is true for petitioner's fourth claim, and the result is the same finding of abandonment. In the alternative, neither claim has any merit in federal habeas corpus.

*Facts*

The facts set forth by the California Court of Appeal, (People v. Dixon, 2004 WL 2729757 (Nov. 29, 2004)) are accurate, and they are reproduced here[2]:

> In early December 1996, Richard Brewer spoke with Trevor Garcia about doing a robbery. Brewer said he and two others had done a "lick," a robbery, and got a good amount of cash. He said it was easy, "easy way in, easy way out." Brewer asked Garcia if he was "down" to do a lick. Garcia agreed.
>
> Ernest Cervantes owned a black 1992 GMC Jimmy. On December 22, 1996, he parked the sport utility vehicle at 15th and S streets near the Monte Carlo Club. When he returned at 8:00 or 9:00 that night, the vehicle was gone. Dixon and Carlos C. stole it by peeling the steering column. The stolen vehicle was seen being driven recklessly around the Southside Park neighborhood. Dixon's half-sister called the police about Dixon's erratic driving.
>
> Brewer discussed doing a robbery again the next morning. Brewer told Garcia that Dixon and Carlos C. had brought over a "G-ride," a stolen vehicle, that would be perfect for a lick. Brewer had talked to Dixon about the robbery two days before. Garcia and Rickie Martinez agreed to do the robbery. Brewer told them to bring Halloween masks. James Glica came by and Brewer told him about the planned robbery; he also agreed to be part of it.
>
> Brewer, Dixon, Carlos C., Garcia, Martinez and Glica met at Southside Park and drove a few blocks to where the G-ride was. Brewer put his gun, a black sawed-off shotgun, in the SUV. The gun was 18 to 24 inches long. They discussed the plan for the robbery; Brewer would go in and intimidate everyone with the shotgun and the others would hold people down and check the cash registers. Dixon would be the get away driver; he would stay outside and keep the car running. Dixon volunteered to drive because the others had been drinking. Glica was in the back of the SUV and kicked out the rear window, in case they were pulled over and he needed to make a quick getaway.
>
> *2 As the group drove through Southside Park, Carlos C.'s girlfriend came out. She had heard the vehicle was stolen and told Carlos to get out and stay with her. Carlos got out.

---

1017, 1023 (7th Cir.1990) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority . . . forfeits the point." The undersigned does not find that the mere attachment of state court briefing to the inoperative initial petition preserves the issues.

[2] Petitioner takes issue with respect to the Court of Appeal's determination of one of petitioner's admissions. That dispute will be addressed in the gang testimony section.

3

The remaining group, Brewer, Dixon, Garcia, Martinez and Glica, stopped to get gas and then went to Brewer's apartment at 13th and G Streets. Garcia lived in the same complex and Martinez often hung around. The managers saw the black SUV and four or five young men, including Brewer, goofing around and play-fighting. They had ski masks.

The group then drove slowly by the front of The Bread Store and then to the back alley. Brewer said "stop" and then, "let's go." Brewer put on a devil mask and Garcia had a black and white mask. Glica tied a red T-shirt over his face and Martinez put a nylon stocking over his head. Brewer had a gun.

The Bread Store, a bakery and delicatessen, closed at 6:00 that night. At 6:30, five employees were present: Dung Van Dao, known as Tony, Hector Montelongo, Kelly Range, Joshua Christian, and Jason Frost. The registers had been emptied and the money dropped in the safe. Only the managers had a key to the safe and no managers were present that night.

Tony Dung was in the back of the store. He heard a noise. The back door opened and a person came in wearing a mask and holding a long gun. The man said, "This is a robbery" or "I am a robber." Dung ran to the front door shouting there was a robbery. Christian and Range followed him out the front door. Range and Christian ran next door to The Beat, a record store, and yelled for someone to call 911.

Montelongo tried to run, but he ran out of strength. A robber other than the man with the gun ordered him to get down and asked where the money was; Montelongo said he did not know. Montelongo was sprayed with mace and kicked in the jaw. Frost moved behind the counter and the man with the gun followed. Frost said he did not have the key. Montelongo heard a shot and then heard Frost moaning. Range described Frost going down like a melting candle. There were two more shots. Frost had a large hole in his side.

Jason Frost, who was 23 years old, had three large gunshot wounds. The shots were fired at close range, no more than five or six feet away, possibly closer. Doctors performed multiple surgeries on Frost, but an infection developed and he progressively got worse. He died on January 3, 1997; the cause of death was multiple system organ failure secondary to shotgun trauma.

After the shooting, the robbers ran out of The Bread Store and got in the SUV where Dixon was waiting. Dixon asked what happened and how much money they got. They drove to S Street where the G-ride died; they got out and ran. They threw their masks and gloves over a wall. Brewer hid the gun in some bushes. Martinez took off on his own and the others ran towards Southside Park. They saw an Asian man working on his truck and tried to carjack him, but a porch light came on and they were scared off.

*3 When they got back to Southside Park, Dixon told Carlos C. about the robbery. "[M]an, we did some way out shit, Los.... Rick and them is crazy." Dixon heard the gun go off three or four times while he was in the car. They did not get any money and someone was shot.

4

The police got a break in this case when Jamie Salyer called crime alert and said Brewer was possibly involved. The police went to Brewer's apartment with a traffic warrant for his girlfriend and got permission to search. They found the shotgun used to kill Frost and shoes with flour on them that was similar to that on the floor of The Bread Store. The shotgun was a Mossberg 12-gauge pump-action shotgun with a pistol grip.

In the course of the investigation, all of the defendants except Brewer gave statements to the police. The police also interviewed several youth who lived in the Southside Park area and knew Brewer, Dixon and other defendants. The police interviewed Carlos C., who was prosecuted for vehicle theft, and his younger brother Alfred, as well as two neighbors, William and Christopher S. Under questioning by Detective Richard Overton these youths told what they knew about the planned robbery both before and after it happened. They told the detective they heard Dixon discussing the robbery before it occurred; Dixon told them not to tell anyone. At trial, as they had at the preliminary hearing, the youths recanted many of their statements to Detective Overton. They claimed variously they could not recall earlier statements, they lied to the officer, they told him what he wanted to hear based on information they had heard from friends or on the news, the officer intimidated or threatened them, and he turned off the tape recorder until they said what he wanted to hear.

The credibility of these witnesses was suspect due to their constantly changing stories. Carlos C. bragged he was "a natural liar" and the trial court commented he had "one of the most unbelievable demeanors that I've seen." Alfred C. initially stated the oath meant nothing to him and everything he would say in court would be a lie.

In his first interview Dixon denied any involvement, claiming he hardly knew Brewer. When the detective left the room, Dixon said to himself: "You all better think for real now. Fuck, man. What the fuck I get myself into? Damn. Well. Damn." Slowly, Dixon admitted more knowledge about the robbery and named Brewer, Garcia, Martinez, and Glica as doing the robbery. Dixon's statement was the first time the police learned the identity of those involved other than Brewer. In subsequent interviews, Dixon admitted he was in the car when the robbery occurred.

Before trial, Trevor Garcia reached a plea agreement with the prosecution. He agreed to plead guilty to manslaughter in return for a 12-year sentence. The plea agreement was contingent upon him telling the truth at trial. The four remaining defendants went to trial in front of three juries (Martinez and Glica had the same jury). Testimony began in March 2001, over four years after the failed robbery and killing. Dixon's jury returned verdicts on August 31, 2001.

*4 During the trial a correctional officer at Rio Consumnes Correctional Center, where Dixon was held, came across letters written by an inmate referring to Detective Overton and speaking to witnesses. The letters were written by Dixon, using another inmate's name and reference number as the return address. The two letters were addressed to Reggie Miller and asked for some help in contacting certain witnesses. The first letter read in part: "Listen, Reggie, do me a favor, and I need you to do it in a, listen, I need you to get at these cats for me which is kind

of blind to the, and need schooling. [] Look, all these fools were underage and was without their parents when they got questions. [] I grew up with these fools and have already got at them in the beginnings, and they came to preliminary hearing and did half ass all right, but I need you to tell them when they come to court they need to say that Detective Overton kept turning off the tape telling them to say that Bobby was the driver and Rick B[.] was the shooter. [] And also they got all they information out of the newspaper and that nobody ever came back and told them anything. [] Reggie, go over this with them, that when the DA says that, didn't you tell Detective Overton this and that, didn't you make that statement, tell them to say, yes, I told him but it was a lie. [] Why did you lie? [] Because I was scared of going to jail."The letter gave phone numbers for Alfred C. and for Willy or Chris S. It also directed Reggie to "say that you are calling for Rick B[.]"

Reggie Miller testified he met Dixon in jail and gave him his address. He did not receive the letters.

People v. Dixon at *1-4.

*Standards*

The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error. Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law. Id. at 405, 120 S.Ct. At 1519. "Contrary to" clearly established law applies to two situations: (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

6

Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521. It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions. While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at 1522 (emphasis in original). The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision. Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002). Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority. Id. An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred. Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003). Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v. Packer, 537 U.S. at 10, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue. "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

\\\\\

*The Gang Testimony Was Not Prejudicial*

A witness for the prosecution, District Attorney Investigator, Henry Kim, made reference to gangs during his testimony in contravention of a court order that no such reference be made. The court made such a ruling because there was no evidence that this robbery/murder was gang inspired or related. Petitioner contends that this reference so prejudiced the jury that he is entitled to have this petition granted. Again, the opinion of the California Court of Appeal sets forth the pertinent facts:

> Henry Kim, an investigator for the district attorney in 1997 and 1998, was called as a witness by the prosecution to explain his investigation of several witnesses, particularly the Southside youths. Before he testified, Kim was admonished not to mention gangs. On redirect-examination Kim did mention gangs and the defense objected and requested a mistrial. The trial court denied the motion for a mistrial and instructed the jury this was not a gang case. Dixon contends the court's corrective action was insufficient to cure the prejudice caused by Kim's statement and the court erred in denying the defense motions for a mistrial.
>
> During cross-examination that the trial court described as "cross-examination 101" and "just basic trial advocacy," the defense attorneys attacked Kim's investigation and the accuracy of his reports. Dixon's attorney asked Kim why he tape recorded his interview with the apartment manager, but not his interviews with the Southside youths. Kim responded, "Do you really want to go into that?" Later counsel asked why Kim repeatedly contacted Alfred C. about the summary of his interview with Detective Overton if Alfred C. agreed it was correct. Kim answered. "I also think it was to develop and make sure that there was no problems [sic] with the circumstances around this case pertaining to his-I can't get into that part, but pertaining to the people that live around him.... [] ... It was mainly for his safety."
>
> *5 On redirect-examination the prosecutor asked Kim why he took Alfred C. to a courtroom. Kim explained Alfred C. was worried about testifying and wanted to see the layout of the courtroom and how close he would be to the defendants and if it was possible "to go through this procedure without being in front of the Defendants." The following then occurred:
>
> "[The Prosecutor]: Is part of the reason why you didn't tape-record statements with the [C.] brothers, the [S.] brothers because you were essentially asking them to affirm earlier statements that had been recorded?
>
> "[Kim]: No, I will tell you why I did not record. Generally when you deal with crimes involving gangs, unfortunately we belabor that issue-
>
> "[Dixon's Counsel]: Excuse me. Your Honor, ask to approach the bench.
>
> "[Brewer's Counsel]: Excuse me? Involving gangs?

8

"[Kim]: Yes.

"[Brewer's Counsel]: I object to that.

"The Court: Stop. Stop. Counsel, approach."

People v. Dixon at * 5.

The defense moved for a mistrial asserting that the deliberate error had poisoned any chance for acquittal. Petitioner recounts that one of the defense attorneys gave his characterization of the jury's "shock" at hearing the gang reference in argument to the judge – however, this argument in no way constitutes evidence. The trial court denied the motion for mistrial, but gave the admonishment as set forth in the appellate opinion:

> When the jury returned, the prosecutor moved to strike Kim's last response and the motion was granted. The court instructed the jury: "During Mr. Kim's testimony immediately prior to the noon recess, Mr. Kim utilized the term, quote, gang, end quote, in one of his responses. Mr. Kim should not have made any reference to gangs in his testimony. You're specifically ordered to disregard that portion of his testimony. This is not a gang case. There is no evidence of gang involvement, nor are any of the defendants gang members. [] Mr. Kim has no basis upon which to testify in this court as to anyone's involvement in gangs. You will be permitted to take Mr. Kim's conduct into account when you evaluate Mr. Kim and/or his testimony during this trial.

People v. Dixon, at *5.

Petitioner does an excellent job of briefing the reason why gang evidence is oftentimes excluded when it is not pertinent to the issues in a case. There is no need to repeat that briefing as obviously, *depending on the circumstances of the case, including the emphasis placed on gang testimony*, such testimony can be prejudicial to the outcome of a case. Depictions of gang violence are commonplace, and there is a chance that a jury would be more likely to connect a defendant to a crime if the jury obtains knowledge that the crime might be related to gang activity – because that is what gangs do – they do drugs, robberies, sex crimes and murders. They wreak vengeance on anyone who may be seen as a snitch. That is why the trial court issued its order in the first place. There was no evidence linking this crime to gang activity;

it was simply an "ordinary" crime involving greed and insensitivity to life.

Petitioner tries two "prejudice" theories on which to have this court vacate the conviction: fundamental unfairness and character evidence. However, on the latter theory, the Ninth Circuit has stated on several occasions that the United States Supreme Court has refused to find that the admission of propensity character evidence offends the Constitution. Mejia v. Garcia, 534 F.3d 1036, 1046 (9th Cir.2008); Alberni v. McDaniel, 458 F.3d 860, 863-67 (9th Cir. 2006).

The only available theory is that the evidence was simply too prejudicial *per se* to be permitted, i.e., the relevance was so slight and the prejudice was so high, that federal, constitutional notions of fundamental fairness have been violated. See Estelle v.McGuire, 502 U.S. 62, 67-70, 112 S.Ct. 475, 479-481 (1991).

At bottom, comparisons of this case to other "gang testimony" cases are not especially helpful. Much depends on the precise issues in the other cases, the quality of the other evidence adduced to show guilt, the amount of gang testimony allowed, the admonitions given to the jury, and the like. Here, the court is confident that the decision of the California Court of Appeal cannot be termed AEDPA unreasonable.

With due respect to counsel, this case was not close with respect to petitioner's guilt, i.e, that he knew he was facilitating the robbery prior to the killing of the employee. Petitioner focuses upon the relative lack of smoking gun testimony about petitioner's knowledge of the robbery before it happened, although there was some, and completely fails to assess the common sense inferences which the jury must have drawn. And, those inferences were overwhelming in favor of establishing petitioner's intent to aid and abet the robbery long before it took place.

Petitioner permitted the vehicle that he stole to be used by all on the robbery/murder day; he was the driver. Absent a different explanation by petitioner (he did not testify), it is illogical to assume that petitioner had no idea where he was headed, and would not

have been the least bit curious about what was intended even though he volunteered to drive. One of the co-conspirators kicked the rear window out of the SUV for quick get-away purposes. Petitioner would have us believe he was not the least bit interested in why this was done. The sawed-off shot gun was conspicuously placed in the SUV, but petitioner would have us speculate that he knew nothing about it. All of the others involved had ski masks and/or Halloween masks which were brought with them – and December is not the month for Halloween parties. Petitioner remained in the car, with the car running, when his cohorts entered the Bread Store after normal closing hours. If that were not enough, evidence of petitioner's consciousness of guilt was introduced – the letters written from jail, with an intended hidden identity, directing witnesses to give a certain testimony. Moreover, petitioner's muttering himself as to what did he get himself into, after disclaiming his relationship with Brewer, was clearly incriminating.[3]

Even if direct testimony had not been introduced establishing petitioner's pre-robbery state of mind – and there was – the jury had more than enough evidence on which to base a verdict of guilty in aiding and abetting robbery and felony murder.

Finally, the admonition given by the trial judge was strong – even to the point of inviting the jury to disbelieve the witness because he had asserted a fact so improperly in the case.

Thus, the one, general, cryptic reference to "gangs," which did not reference the crimes at issue, and which had been elicited on re-direct examination by some apparent baiting on cross-examination, cannot be seen to have tipped a close case over into a guilty verdict. The California appellate court found:

> In any event, any error arising from Kim's unfortunate outburst was harmless. Contrary to Dixon's view of the evidence, our review of the record shows the case against Dixon was very strong. In his opening statement, Dixon conceded he stole the SUV and was waiting in it outside The Bread Store during the robbery. Garcia's detailed testimony unequivocally established that Dixon was part of the

---

[3] Even if petitioner was not privy to the precise robbery target, the Bread Store, he certainly knew a robbery was the purpose of the expedition that evening.

11

| | |
|---|---|
| 1 | robbery plot and his testimony was corroborated by the statements of the Southside youths that implicated Dixon both before and after the robbery. The |
| 2 | defense attempt to discredit these statements to Detective Overton was fatally undercut by evidence of Dixon's letters seeking to influence the youths' testimony. |
| 3 | These letters also provided persuasive evidence of a consciousness of guilt. The size of the Mossberg pump action shotgun made it implausible that Brewer could |
| 4 | have hidden it from Dixon. The improbability of Dixon's story was evident even to his parents. During an interview the detective left the room and Dixon's parents |
| 5 | questioned him about his role in the robbery. They found his denial of any involvement difficult to believe. |

People v. Dixon at *7.

Given the AEDPA standards, which require a finding in excess of "clear error," the undersigned cannot find that the appellate court's lack of harm conclusion was unreasonable. The error by Kim did not fundamentally affect the fairness of the verdict in this case.

*The Aiding and Abetting Jury Instruction*

Petitioner believes that the jury instruction given on aiding and abetting was not faithful to California law. He faults the California appellate court for finding to the contrary. He then cites cases where there was no dispute but that a faulty instruction had been given, discusses the due process implications of such an error, and concludes that petitioner's due process rights were violated. However, petitioner is incorrect in his predicate – that an error under state law occurred at all – at least one that this court is empowered to correct. The issue is well set forth by the California Court of Appeal in this case:

> Dixon contends reversal of his murder conviction is required due to instructional error. He contends the 1998 revision to CALJIC No. 8.27 failed to adequately convey that an aider and abettor may be guilty of felony murder only if he forms the intent to aid and abet the underlying felony before the fatal shot is fired. He asserts that since there was evidence to support the view that he did not aid and abet the attempted robbery until after the shooting, the trial court was required to modify sua sponte the CALJIC No. 8.27 instruction. Finally, Dixon contends he did not waive this contention by failing to request a modification or to otherwise raise it below because the instructional error affected his substantial rights by permitting a conviction on an invalid legal theory. (Pen.Code, § 1259.)

People v. Dixon, at *7.

\\\\\

The appellate court went on to explain why the CALJIC instruction given did not violate California law. The explanation is unimportant to the resolution of the federal issue. Petitioner takes issue with this state law determination and discusses at length his view of state law with lengthy reference to other state cases. However, no matter how petitioner attempts to slice it, he is disagreeing with state law. A federal court in habeas is powerless to "correct" the state court's view of the lawfulness of the CALJC instruction unless the holding is a subterfuge, a sham, simply designed to avoid the federal issue. Peltier v. Wright, 15 F.3d 860, 862 (9th Cir.1994), Aponte v. Gomez, 993 F.2d 705, 707 (9th Cir.1993), Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir.1989). The state appellate opinion in this case in no way could be labeled a subterfuge or sham.

Petitioner's jury instruction claim is without merit.

*Conclusion*

IT IS HEREBY RECOMMENDED that the entire petition be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: 03/17/09

/s/ Gregory G. Hollows
_____
UNITED STATES MAGISTRATE JUDGE

GGH:gh:035
dixo0410.57